## Case No. 4,037a.

### DOW v. HARE.[1]

District Court, N. D. California. May 12, 1876.

CHARTER PARTY—BREACH BY MASTER—LIABILITY OF CHARTERER FOR PORT CHARGES AND DISCHARGING CARGO—DAMAGES FOR DETENTION.

[1. The master of a vessel chartered to carry coal consigned to a naval vessel at Ounalaska, being ready to sail next day. so informed the charterer, who, wishing to cancel the contract with the naval authorities. left to consult with them for that purpose, and instructed the master, if he (the charterer) did not come on board in the morning. to proceed according to his instructions. Having procured permission to deliver the coal to other parties, the charterer returned about daylight. saw the vessel, but made no effort to board her until some hours later, at which time she had sailed. Held. that the master was not guilty of misconduct amounting to a breach of the charter party.]

[2. On arrival at Ounalaska, the master, not finding the naval vessel. waited for a month, and news having arrived of her loss by shipwreck, after waiting some time for a berth. he landed the coal. The charter party provided that the cargo should be discharged free of all expense to the vessel, the charterer to pay port charges. Held that, under the circumstances, the charterer was liable for both the port charges and the costs of discharging the vessel.]

[Cited in McLeod v. 1,600 Tons of Nitrate of Soda, 55 Fed. 532.]

[3. The charter party likewise provided that the charterer should pay $100 per day for every day's detention of the vessel by his default.

---

[1] [Not previously reported.]

*Held,* that he was liable for the agreed sum for the period of delay at Ounalaska.]

[Cited in McLeod v. 1,600 Tons of Nitrate of Soda, 55 Fed. 532.]

[This was a libel by George W. Dow, master of the bark Sierra Nevada, against Charles Hare, for breach of a charter party.]

HOFFMAN, District Judge. On the 3rd of June, 1875, the respondent chartered the bark Sierra Nevada, of which libelant was master, to convey a cargo of coals, then on board, and of which the respondent was the owner, from San Francisco to the port of Ounalaska. The charter party provided that ten running days should be allowed for the discharge of the cargo, to commence on the date of arrival; charterer to furnish lighter when required for ballasting the vessel at Ounalaska free of expense; and for each and every day's detention by default of charterer or his agent $100 per day were to be paid to the respondent or his agent; cargo to be discharged by charterer free of all expense to vessel; free of commissions; any port charges to be borne by charterers. On the 7th and 10th days of June, respectively, the libelant executed and delivered two sets of bills of lading. By the first, he agreed to deliver two hundred tons of coal to the Alaska Commercial Company or assigns; cargo to be received at Ounalaska and delivered as per condition of charter party. By the second set of bills of lading, the master agreed to deliver 587 tons of coal, more or less, unto "U. S. Steamer Saranac or to assigns;" cargo to be received at Ounalaska and delivered as per condition of charter. As the time when the Saranac was expected to arrive at Ounalaska was near at hand, the United States navy officers, with whom the respondent had contracted for her supply, were urgent in demanding the dispatch of the vessel, threatening to annul the contract unless she sailed forthwith. The respondent therefore frequently, and with some intemperance of language endeavored to hasten the libelant's preparations for departure. On the 10th, about 12 o'clock, the vessel was cleared by him, and on the same day a tug was ordered by the master for the ensuing morning. On the afternoon of same day the libelant, at the request of the respondent, went to the office of the Alaska Commercial Company, to give a new bill of lading for the coal to be delivered to the company. While there, he was asked by an agent of the company what he would do with the steamer's coal if she did not arrive, to which he replied that he supposed he would bring it back again. The respondent then said he would instruct the company to receive it. To this, libelant objected that he had signed bills of lading for coal to be delivered to United States officers on board the Saranac, and that he could not make any other disposition of it without the admiral's orders. The rest of the conversation is differently related by the parties.

The libelant states that Hare then asked him when he was going to sea, to which he replied that he well understood that the pilot and tug were ordered, the crew on board, and the vessel ready to go with the next morning's tide. Hare then said: "I don't want to detain you a moment. I can't go to Mare Island and back before 11 a. m. to-morrow, which I shall have to do to get bill of lading endorsed." He then seemed to think of the cattle boat; said he would get back by daylight and come on board, and charged the libelant particularly not to wait for him a moment.

Mr. Hare testifies that he certainly expected the libelant to wait for him, and denies that he ever instructed him not to do so. Mr. Greenbaum and Mr. Newmann, agents of the company, who were present, state that they do not remember that Hare told the libelant not to wait for him. But Mr. Newmann is unable to state that he was present at all the conversation. Mr. Hare thereupon hurried to the Mare Island boat, went to Mare Island, procured from the admiral an order to the respondent for the delivery of the coal to the Alaska Company, if the Saranac should not be in port, and returned in a cattle boat to this city, where he arrived about daylight. On his way to the landing, he passed near the vessel, and observing no movement on board, and no one on deck, he proceeded to his house, took breakfast, and then went to his store. From his store, he went to the steamtug office, and asked a man, who was sweeping the rooms, for the order book. Finding, as he says, no entry of an order, he returned to his store, wrote two letters, and then proceeded to the wharf, to go on board the bark and see the respondent. He found that the vessel had sailed. From the evidence of the persons on board the vessel, the captain of the steamtug and the pilot, the vessel must have got away between 8½ and 9 o'clock. It is also clear that the tug had been ordered the day before. The vessel proceeded on her voyage, arrived at Ounalaska on the 14th of July, and discharged the coal consigned to the Alaska Company. She then hauled out in the stream to await the arrival of the Saranac. On the 14th of August, the schooner Siam arrived, and reported the loss, by shipwreck, of the Saranac. On ascertaining that the Siam brought no orders for him, the libelant concluded that it was for the best interests of all parties to land the coal. He was informed by the agents of the company that he could not come to the wharf until the Siam had finished discharging. This occurred on the 28th. The discharge of the Sierra Nevada was then commenced, and completed on the 13th of September. He then took in ballast, which he got on board on the 17th. On the 20th he sailed. The coal was left in charge of the company's agents, to be held subject to the libelant's claims. The libelant now claims for demurrage at $100 per day for fifty-two

days, viz. from and including the 24th of July to and including the 14th of September, $5,200; for expense of discharging coal, $1,174; and for port charges, $10.

The respondent insists that he is not liable for the consequences of the nonarrival of the Saranac: (1) Because he had made provision for that contingency, and that his arrangements were frustrated by the misconduct of the master in sailing away contrary to orders. (2) That, by the terms of the charter party, he is liable only for detention of the ship caused by his default, and that he is not responsible for the shipwreck and consequent nonarrival of the Saranac.

1. Was the master in fault in not waiting for Mr. Hare to come on board after his return from Mare Island? The libelant testifies very positively that the respondent was emphatic in his instructions to him not to wait a moment. Although neither Mr. Greenbaum nor Mr. Newmann recollect this fact, yet it is to be noted that Mr. Hare does not pretend that he gave any directions to the master to await his return. He evidently expected to reach this city by daylight, as in fact he did, and there was no occasion for any instruction to the master to delay his departure. What, then, was the situation in which the latter found himself when the tug came alongside to take him to sea? Mr. Hare had been urging his departure for some days. He had informed him that the naval authorities threatened to annul their contract unless the vessel sailed at once. In point of fact, although it does not appear that the master knew it, an officer was on the way to the city with orders to cancel the contract if the vessel had not sailed. So impressed was Mr. Hare with the necessity of dispatch that, on the 9th, he telegraphed to the admiral that "the ship had gone below, and would be towed to sea in the morning." The vessel in fact had not, at that time, left her moorings, and did not get under way until the morning of the 11th. Mr. Hare had, on the previous day. cleared the vessel, and knew that she was ready for sea. A pilot and steamtug had been engaged. When the latter came alongside, the master, in the absence of specific instructions to the contrary, had but one course to pursue. He had a right to suppose, from the failure of Mr. Hare to present himself, that either he had not succeeded in obtaining the order he desired, or that he had been unable to come down in the cattle boat. He therefore could not be expected until 11 o'clock. Had the master, under these circumstances. determined to wait. and had Captain Phelps arrived by the 11 o'clock boat and annulled the contract, what excuse could he have offered to the respondent? If Mr. Hare had not chosen to assume that the vessel was not going to sea. he could readily have communicated with the master. The vessel lay at a very short distance from the wharf where he landed from the cattle boat. He arrived at about daybreak. Instead of

going on board, he wasted several hours, and only reached the wharf opposite her place of anchorage about 9 o'clock. Even then, he could, by taking another tug, have readily overhauled her. She lay becalmed at short distance from the Heads during the entire day. His neglect to make, until the last moment, any provision for the nonarrival of the Saranac, and his conduct after his return from Mare Island seem to show that he was not deeply impressed with the importance of doing so. It could have been useful only in case the Saranac were disabled or wrecked, an event extremely unlikely to occur. Certainly neither he nor the master could have anticipated it. So far as appears, the latter acted in entire good faith. He had no motive to hasten his departure except the desire to obey orders. He states that he would have preferred to remain three days longer. He certainly could not then have foreseen the long detention to which he would be subjected at Ounalaska.

My conclusion is that the respondent has failed to show that he has been liberated from the obligations of the charter party by the misconduct of the libelant.

The charter party provides that the cargo shall be discharged by the charterer free of all expense to the ship. Port charges are also to be borne by the charterer. The master. in landing and storing the cargo. seems to have acted prudently and for the interest of all concerned. He is, therefore. entitled to recover the sums paid by him for discharging the cargo and for port charges.

With regard to the claim for demurrage there is more difficulty. By the terms of the charter party, demurrage is to become due only for detention caused by default of the charterer or his agent. In all contracts of affreightment, there is, in the absence of an express contract, an implied agreement that the consignee of goods will provide for discharging and receiving them within a reasonable time, to be ascertained by the jury, on consideration of all the circumstances. But the consignee may explain or excuse his delay by proof of extraordinary circumstances beyond his control, which prevented him. Cross v. Beard. 26 N. Y. 85. In Towle v. Kittell, 5 Cush. 18, it was held, where the vessel was ordered away from the usual place of discharge by competent authority on account of the prevalence of an infectious disease. that the delay thereby occasioned was not caused "by the default" of the charterer. But in this case no fault whatever could be imputed to the charterer or his agent., The delay was caused by superior authority. It would seem to be as much a part of the contract, that the shipper shall provide a consignee to receive the goods. at the place of destination, as that the carrier shall transport and deliver them. If, on the arrival of the vessel, the consignee cannot be found after diligent inquiry by the master. the delay so occasioned ought.

in justice to be deemed to have been caused by the default of the shipper or his agents. So, in this case, if the coal had been consigned to the Alaska Company, and, by reason of the want of dockage facilities, the discharge had not been completed until after the lay days had expired, no doubt would, I presume, be entertained that the detention should be attributed to the default of the agents of the charterer, for the latter covenanted to discharge the vessel within a prescribed time. But, suppose that the Saranac had arrived and received the coal, but not until after the expiration of the lay days; ought not the charterer to be responsible for the detention? By the bill of lading, the Saranac was the consignee to whom the coal was to be delivered. The consequences of her unpunctuality ought to be borne rather by the party whose agent she, in effect, was, and who had virtually stipulated that she would be ready to receive the whole cargo within ten days after the ship's arrival, rather than upon the shipowner, who was a stranger to the contract with the government, and was entirely subject to the charterer's directions as to the parties to whom the cargo was to be delivered. If the charterer would be responsible for the delay of the steamer in arriving, it follows that he is responsible for her total failure to arrive, provided the master has not waited for her an unreasonable time, which is not pretended in this case. The voyage described in the charter party is a voyage from San Francisco to Ounalaska. The bill of lading, made some seven days afterwards, designates the steamer Saranac or assigns as the consignee. It does not appear that, at the time of making the charter party, the master was aware that the coal was to be delivered to the steamer. But, assuming that he was, and that he also knew that the steamer, although expected, was not then at Ounalaska, and that. therefore, it was possible she might not reach that port at all, it seems more reasonable to suppose that the consequences of such an accident were intended by the parties to be borne by the shipper rather than by the ship; for the former reaped the whole benefit from the contract with the government, had the means of estimating the probability of the Saranac's arrival. and could have provided for an indemnity in case delivery to her was delayed or prevented by her non-arrival.

I have been referred to no case, the circumstances of which bear any close analogy to those of the case at bar. So far as I know, the question, as here presented, is novel. I feel much hesitation in deciding it, and hope it may be submitted to an appellate court.

A decree will be entered in favor of the libelant for the amount claimed in the libel, less two days' demurrage, which seems to be overcharged.

[NOTE. On appeal to the circuit court, the decree was affirmed without opinion.]